DANIEL COUGHLIN

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa, January* 19, 1893.

1. IMPARTIAL JURY — *what constitutes.* It was a cardinal rule of common law that the jurors, to be impartial, should stand indifferent between the parties. A juror was required to have such freedom of mind that he should stand indifferent. He should be wholly free, even from the suspicion of bias.

2. SAME — *constitutional guaranty.* The constitution must be construed as guaranteeing to every defendant accused of crime a trial by an "impartial jury," as that term was understood at common law.

3. SAME — *constitutionality of sec.* 14, *chap.* 78, *R. S.* The proviso to section 14 of chapter 78 of the Revised Statutes, declaring that a juror shall not be disqualified from acting as such in a criminal case, from the fact that he has formed an opinion or impression, based upon rumor or upon newspaper statements, about the truth of which he has formed no opinion, "if he shall, upon oath, state that he believes that he can fairly and impartially render a verdict therein in accordance with the law and the evidence, and *the court shall be satisfied* of the truth of such statement," is not in violation of the constitutional rights of one tried on a charge of crime.

4. SAME — *sec* 14, *chap.* 78, *R. S., construed.* Under that statute, as framed, the competency of a juror remains as it was before, a judicial question, to be determined by the court from the evidence, and the court must be satisfied now, the same as before the statute was passed, of the impartiality of the juror before deciding to overrule the defendant's challenge.

5. The constitutional guarantee of the right to a trial by an impartial jury has the same force since that statute as before, and hence the statute can be construed and enforced only in subordination to that provision of the constitution. The statute can not in any degree change the essential qualifications, which jurors must possess, but it merely furnishes a new test by which those qualifications are to be determined.

6. That statute makes the statement of the juror that he can render a fair and impartial verdict according to the law and the evidence, competent, as bearing upon the question of his impartiality, and requires the court to hear and consider such statement, if the juror sees fit to make it. The result is to make the competency of the juror as affected by his opinions based upon rumor or newspaper statements a question of fact. But the statute does not attempt to determine in the least what

shall be the probative force of the statement of the juror when made, or how far it shall have the effect of relieving him of the disqualification arising from his opinion.

7. SAME—*test of impartiality.* When the opinion of the juror is only slight or transient. or is hypothetical, considerable reliance is placed upon his statement under oath that his opinion is not of such character as will interfere with his action as a juror, and such statement is one of the most satisfactory tests of his impartiality.

8. SAME — *opinions which disqualify.* But when it is once clearly shown that the juror has a fixed and positive opinion as to the merits of the case. or as to the guilt or innocence of the defendant, his statement that, notwithstanding such opinion, he can render a fair and impartial verdict according to the law and the evidence, has little, if any, tendency to establish his impartiality. His statement that he can render a fair and impartial verdict does not tend to show that he is not partial, as it does not tend to show the non-existence of the fixed and decided opinion to which he has already confessed.

9. Where the examination of a juror showed clearly that he had fixed and settled opinions as to the guilt or innocence of a party on trial for murder, and as to most of the facts and circumstances relied on by the prosecution to show defendant's guilt, and disclosed a prejudice against the defendant and the members of a society to which he belonged, it was held that the juror was incompetent, notwithstanding his statement, drawn out by cross-examination, that he thought he could render a fair and impartial verdict, according to the law and the evidence.

10. If a juror has made up a decided opinion on the merits of the case, either from a personal knowledge of the facts, from the statements of witnesses, from the relations of the parties or either of them, or from rumor, and that opinion is positive and not hypothetical, and such as will probably prevent him from giving an impartial verdict, a challenge to him should be allowed. But if the opinion be merely of a light and transient character, such as is usually formed by persons of every community upon hearing a floating report, and which may be changed by the relation of the next person met with, and which does not show a conviction of the mind and a fixed conclusion thereon, or if it is hypothetical, the challenge ought not to be allowed.

11. If the judgment of the juror is convinced, if his belief is established from facts, of the truth of which he has no reasonable doubt, of the guilt or innocence of the accused, or that one party or the other should recover, or the existence of certain facts has been so established in his mind as to produce conviction, he is incompetent. Neither party should be put to the necessity of producing proof to remove a preconceived opinion.

12. No case in this State can be found where the juror. after admitting the existence in his mind of a positive opinion upon the merits,

has been permitted to establish his own competency by testifying that, notwithstanding his opinion, he can or will render a fair and impartial verdict. But such opinion has uniformly been held to be a disqualification *per se*, and is incapable of being removed by the testimony of the juror, or other evidence tending to show that it will not affect his verdict.

13. A decided and positive opinion as to the merits of the case raises such manifest presumption of partiality as at common law would constitute a principal cause of challenge. The incompetency of the juror follows as a necessary legal consequence which is incapable of being rebutted.

14. Challenging jurors — *at common law*. Challenges to jurors, based upon an allegation of bias, favor or partiality, were, at the common law, divided into two classes, viz., principal challenges and challenges to the favor. A principal challenge was grounded on such manifest presumptions of partiality that if the fact alleged was proved to be true, the disqualification of the juror followed as a legal conclusion, incapable of being rebutted. On challenge to the favor, the disqualification arose as a question of fact to be determined by the triers, the evidence adduced in support of the challenge leading to no presumption not subject to rebuttal by other evidence.

15  Same — *grounds of challenge — at common law*. Among the principal causes of challenge were consanguinity or affinity of the juror with either of the parties within the ninth degree; that the juror was godfather to the child of either party, or *e converso;* that the juror was of the same society or corporation with either party, or had an action implying malice depending between him and the other party: or was tenant or within the distress of either party; or was master, servant, counselor, steward or attorney of either party; or after he was returned he ate and drank at the expense of either party, or had been chosen as arbitrator by either party. By most of the authorities it was held to be ground of principal challenge that the juror had formed and declared his opinion touching the matter in controversy.

16. Same — *grounds of principal challenge — right to controvert*. When the matter alleged was ground for principal challenge, all the challenging party was required to do was to prove the existence of the ground, and that, on being shown, rendered the juror incompetent, and no inquiry was permitted as to whether, notwithstanding the fact shown, he could sit as a juror and render a free and impartial verdict.

17. Same — *grounds of principal challenge — absolute disqualification under our law*. Most of the objections to jurors which at common law were held to be ground of principal challenge, are held with us to be absolute disqualifications; that is. upon mere proof of the fact alleged, the disqualification follows as a legal conclusion, and evidence is not admitted to show that. notwithstanding the fact proved, the juror is really impartial.

18. Same — *burden of proof.* The party interposing a challenge to a juror has the burden of sustaining it by proof.

19. Appeals and writs of error — *overruling challenge of jurors — subject to review.* The rule of the common law making the decision of the triers of jurors challenged to the favor final. and not subject to review on error, has not obtained in this State, and the action of the trial court in overruling a challenge to a juror for partiality is subject to review by this court. It is the duty of this court to review the action of the trial court in all cases as to the competency of jurors.

Writ of Error to the Criminal Court of Cook county; the Hon. S. P. McConnell, Judge, presiding.

Mr. William S. Forrest, Mr. Russell, Mr. Wing and Mr. Daniel Donahue, for the plaintiff in error.

Mr. George Hunt, Attorney General, for the People.

Mr. Chief Justice Bailey delivered the opinion of the Court :

On the 29th day of June, 1889, an indictment was presented in the Criminal Court of Cook county by the grand jury, against Daniel Coughlin, Martin Burke, John F. Beggs, Patrick O'Sullivan, Frank J. Woodruff, Patrick Cooney and John Kunze, charging them, and divers other persons to the grand jury unknown, with having conspired to kill and murder Patrick Henry Cronin, and that, in pursuance of such conspiracy, they did kill and murder said Cronin. At the August term, 1889, of said court, Coughlin, Burke, O'Sullivan, Beggs and Kunze were tried on the indictment, and at such trial Beggs was acquitted, Kunze was found guilty of manslaughter and his punishment was fixed at imprisonment in the penitentiary for the term of three years, and Coughlin, Burke and O'Sullivan were each found guilty of murder, and their punishment was fixed at imprisonment in the penitentiary for the terms of their natural lives. The verdict, as to Kunze, was set aside by the court and a new trial was awarded, and Coughlin, Burke and O'Sullivan were each sentenced to imprisonment for life, in accordance with the verdict.

To obtain a reversal of the sentence as to himself, O'Sullivan sued out a writ of error from this court returnable to the October term, 1890, and the cause thus brought here for review was submitted to this court on the printed arguments of counsel at the March term, 1891. Afterwards, and before the announcement of our decision, O'Sullivan died, and thereby, as we held in denying a motion by his administrator to enter judgment *nunc pro tunc* as of a date prior to his death, his writ of error was abated. *O'Sullivan* v. *The People, post*, p. 604.

Coughlin has now sued out a writ of error returnable to the October term, 1892, of this court, and has assigned numerous errors, and the cause thus presented having been submitted on the briefs and arguments of counsel, is now before us for decision.

A brief statement of the facts surrounding the homicide, and of the circumstances under which it is supposed to have been committed, so far as they were disclosed at the trial, will be necessary to a proper understanding of the questions raised by the assignments of error. On and prior to May 4, 1889, Patrick Henry Cronin was a physician and surgeon, and was residing and having his principal office at No. 486, North Clark street, Chicago, and was engaged in the practice of medicine and surgery. He also had a down-town office in the Chicago Opera House Building, on the corner of Clark and Washington streets, that being about one and one-half miles south of his residence. At about 7.30 o'clock, P. M. of May 4, 1889, a stranger, driving a horse and buggy, called at 486, North Clark street, for Dr. Cronin, and presented a business card of Patrick O'Sullivan, who was an ice dealer, and said that one of O'Sullivan's men had been seriously injured, and asked Dr. Cronin to go at once to render him professional assistance. The man who thus called seemed to be in haste, and Dr. Cronin thereupon hurriedly collected his utensils, bandages, cotton, and such other materials as he supposed might be needed, and got into the buggy with the stranger and was by him driven away rapidly in a northerly

direction, towards the ice-house and residence of O'Sullivan. That was the last time Dr. Cronin was seen alive by any of his friends so far as is known. His body was found in a high state of decomposition on the 22d day of May, 1889, in the catch-basin of a sewer, in the north part of the city, several miles north of O'Sullivan's residence.

The evidence tending to connect Coughlin and his co-defendants with the homicide is purely circumstantial. The theory of the prosecution is, that Dr. Cronin was put to death in pursuance of a conspiracy to take his life, entered into by the defendants and other parties who are unknown; that to accomplish the objects of such conspiracy, he was induced, in the manner already indicated, to go to a house near O'Sullivan's residence, known as the Carlson cottage, on pretense that the person who had been injured and who needed his professional services was there; that he was there met by all or a portion of the conspirators and murdered, and that his body was thereupon taken by those who had put him to death and deposited in the catch-basin where it was afterwards discovered.

It appears that Dr. Cronin and all the defendants who were tried, except Kunze, were natives of Ireland or of Irish descent, and were members of an organization composed exclusively of persons of Irish nativity or descent, known as the "United Brotherhood," and commonly called the "Clan-na-Gael." According to the theory upon which the defendants were tried, as such theory was outlined by the state's attorney in his opening statement to the jury, the "United Brotherhood" was a secret, oath-bound organization, having a membership and subordinate bodies in all parts of the country; that the objects for which it was formed and kept in existence were, to assist, by force of arms or otherwise, in freeing Ireland from its dependence upon the government of Great Britain and in securing its national independence; that for the purpose of concealing its real purposes from the public, its subordinate bodies or "Camps" were called and generally

known as literary societies; that the affairs of the organization were directed by an executive committee, that committee being originally composed of members from each district, but that at a meeting of the organization held in Chicago in 1881, the executive committee was reduced to five members; that this executive board had the power to command, and that no member had a right to disobey, and that whatever it commanded the members were required to do; that the members were required by their oaths and by the laws of the organization to obey the executive committee, even in defiance of the government or any other authority; that three certain members of the executive committee, who constituted the majority, assumed control of the organization; that from year to year, large sums of money were raised to be used for the purpose of securing the independence of Ireland which came into their hands; that these three men, after assuming supreme control of the organization, adopted and put in force a line of policy which was disapproved by a considerable portion of the membership, and that dissatisfaction arose in relation to the accounts given by them of the society funds, and that thereupon a serious division arose in the organization, Dr. Cronin being one of the leaders of the opposition; that in consequence of his opposition to the three men in control of the organization and popularly known as the "Triangle," and of his efforts to subject them to discipline, a bitter feeling was created between him and them, which extended to the membership of the organization, and among others, to Camp 20, of which Coughlin, Burke and O'Sullivan were members; that Dr. Cronin was denounced as a traitor and a British spy, and that at a meeting of Camp 20, a committee, of which defendant Coughlin was a member, was appointed to try him, and that such committee afterwards tried him and ordered that he be put to death, and that his death followed in execution of that order.

We have deemed it necessary, in view of questions which will be hereafter discussed, to state thus far the theory of the

prosecution in relation to the complicity of the "United Brotherhood" and especially of the members of Camp 20 in the alleged conspiracy to take the life of Dr. Cronin, as detailed by the state's attorney in his opening statement to the jury, although very little if any evidence was given at the trial to support it. There seems to have been an entire failure to prove that any committee was appointed by Camp 20 to try Dr. Cronin, or that defendant Coughlin was a member of a committee appointed for that purpose, or that Dr. Cronin was ever tried or condemned by such committee, or that any such proceedings as those alleged were had in Camp 20 looking to his accusation, trial or condemnation. There is evidence tending to show that, at a meeting of Camp 20 held February 8, 1889, Coughlin made a motion for the appointment by the senior guardian of a committee of three, but it does not appear that such committee was appointed for the trial of Dr. Cronin, but the evidence seems to indicate that it was appointed for an entirely different purpose.

The principal facts, in addition to those above stated, which the evidence tends to show, and which are relied upon to establish the defendants' guilt, are these: On the 20th day of February, 1889, one J. B. Symonds rented rooms at 117, South Clark street, directly across the street from Dr. Cronin's downtown office, and on the following day purchased furniture, a carpet, a valise, a trunk and a trunk strap, which were delivered to him at the rooms which he had rented. On the 20th day of March, 1889, defendant Burke, under the name of Frank Williams, rented a cottage situated in the immediate vicinity of O'Sullivan's residence owned by Jonas Carlson, and spoken of by the witnesses as the Carlson cottage. Burke, immediately after leasing the cottage, went to O'Sullivan's house and had a conversation with him, in which he was overheard by Carlson to say: "The cottage is rented." A day or two afterwards, Burke and an unknown man removed the furniture, carpet, trunk, etc., from the rooms at 117, South

Clark street, and placed them in the Carlson cottage. On one or more occasions thereafter and prior to May 4th the trunk was seen by a witness in the cottage. Shortly prior to April 20th a conversation took place between Carlson and O'Sullivan in which Carlson asked : "Do you know my tenants ? " to which O'Sullivan replied : "I know one of them, is the rent due ? " Carlson answered : "Not until the 20th ; " and O'Sullivan then remarked : "He will pay you then." Burke was absent from the cottage from the time he rented it until April 20th, when he reappeared and paid the rent for the second month, but the cottage was not occupied by him prior to May 4th, the day of Dr. Cronin's disappearance.

On or about March 30th, O'Sullivan called on Dr. Cronin at his down-town office and entered into a contract with him by which he employed the Doctor to render all necessary professional assistance to his, O'Sullivan's, employes who might be injured in his service, and to others who might be injured by them, at a fixed sum, viz., $6 or $8 per month, and it was arranged that as O'Sullivan might be out of town or sick, the messenger calling for the Doctor should identify himself by delivering to the Doctor one of O'Sullivan's business cards, and O'Sullivan, at the time of making the contract, handed to Dr. Cronin some of his cards.

On the 4th day of May, 1889, Coughlin called at the livery stable of Patrick Dinan, at No. 260, 'North Clark street, and engaged a horse and buggy for a friend of. his, saying that his friend would call for it at about seven o'clock in the evening. At about the hour indicated, a stranger to Dinan called and inquired if Coughlin had ordered a horse and buggy for him, and being answered in the affirmative, he claimed to be the party for whom Coughlin had ordered it, and a horse and buggy being delivered to him, he got in and drove away in the direction of Dr. Cronin's residence. The evidence tends to identify the horse thus obtained from Dinan with the one in the possession of the messenger who called for Dr. Cronin at

about 7.30 the same evening and with which the Doctor was a few minutes later driven away in the direction of the Carlson cottage. At about 9.30 the same evening the horse and buggy were returned to the livery stable, the horse being bespattered with mud, and coming, as the evidence tends to show, from the north.

The evidence tends to show the presence of Coughlin and another man, not identified, walking along the sidewalk in the vicinity of the Carlson cottage at about four o'clock in the afternoon of May 4th, and at about five o'clock the same afternoon, defendant Burke was met by Carlson coming out of the cottage, Burke saying to Carlson that he had got to fix the cottage up. At about seven o'clock the same evening, the voices of two men conversing in the cottage were overheard by Carlson.

Paulina Hoertel, one of the witnesses for the prosecution, testifies that at about eight o'clock the same evening she was passing the Carlson cottage, and that as she was passing, two men drove up to the cottage in a buggy, one of whom got out and went into the cottage while the other drove away ; that immediately after the man entered the cottage, she heard a sound as of blows, and the exclamation, " Oh, God, Jesus!" Another witness testifies that about half past eight, he saw two men, whom he claims to identify as Coughlin and Kunze, drive up to the cottage, and that the one whom he identifies as Coughlin went into the cottage, apparently opening the front door with a key, and that the other man soon afterward drove away.

There is evidence tending to show that at about ten o'clock of the same evening O'Sullivan, Coughlin and Kunze were together in a saloon in the vicinity of the Carlson cottage. Also that late in the night of May 4th, sounds were heard in the cottage as of nails being driven into a box. At about 11.30 the same night, three unknown men were seen travelling east on Fullerton avenue near Cooper street in a wagon drawn by a horse described as dark grey or bay, the wagon containing a trunk or box. About midnight three unknown men were seen proceed-

ing north on Clark street near Frederick street, with a wagon
containing a box and drawn by a horse described as bay or black.
At about one o'clock three unknown men were seen in Edgewater
in a wagon containing a box, and drawn by a horse described as
bay. At about two o'clock the same parties were seen again
without a box going south on Clark street near its intersection
with Diversey street. The next morning a trunk broken open
and blood-stained and containing some cotton-batting was found
near Evanston avenue. Stains were also found on the steps of
the Carlson cottage and the sidewalk in front of it, and also the
tracks of men on the side of the street nearest the cottage.
Afterward, the floor of the cottage was painted by some one
unknown, and later one or more blood-stains were found on
one of the walls of the cottage.

The foregoing, though not intended as a complete resume of
the evidence introduced by the prosecution, is a sufficient state-
ment, for the purposes of this opinion of the leading circum-
stances which the evidence tends to establish and upon which
the prosecution relied for a conviction of the defendants.

Counsel for the plaintiff in error have assigned upon the
record no less than forty-six errors, and in support of their
assignments of errors, have filed exceedingly, and, as we think,
needlessly voluminous arguments, containing matter sufficient
to fill about one and one-fourth volumes of the size of the Illi-
nois Reports, and in which they have discussed, with great
amplitude, a large variety of propositions upon which they ask
a reversal of the judgment against their client. This mode of
argument has of itself presented a serious obstacle in the way
of an early decision of the case. Fortunately, however, as we
view the record, we shall not be required to consider or discuss
the great mass of the propositions advanced, but shall base our
decision upon only one portion of the numerous errors assigned.

In impaneling the jury, the court overruled a challenge for
cause interposed by Coughlin and certain of his co-defendants,
among other jurors, to Elijah J. Bontecou and Benjamin F.

Clark, and they were each sworn as jurors, and were members of the jury which tried the case. At the time these jurors were called, the regular panel had been exhausted, and they were jurors summoned on a special venire, by a special bailiff appointed by the court for that purpose. At the time they were called and examined as jurors, Coughlin had exhausted his peremptory challenges allowed him by law, and the same seems to have been true of his co-defendants who joined in his challenge for cause.

Elijah J. Bontecou, being examined by counsel for the defendants, testified as follows: I have read the newspaper accounts of the commission of the crime for which these men are on trial. Have seen in these accounts the names of the defendants. Have read such accounts daily since March 4th. Think I read the testimony at the inquest, but am not sure. I have sometimes talked about the guilt or innocence of these men. Can hardly say that I have discussed the question fully. I have discussed the evidence with reference to them pro and con. I have now an opinion whether Burke, O'Sullivan and Coughlin are guilty. Have no decided opinion as to the guilt or innocence of Kunze. Having heard but one side of the case, as to Burke, O'Sullivan and Coughlin, I should say that I had formed an opinion. That opinion is rather firmly held. I should say that it amounts to a conviction. I sometimes have a doubt as to its correctness. My doubt as to its correctness is only as we doubt newspaper reports, that is all. I supposed the articles to be true.

I have an opinion as to whether Dr. Cronin was killed at the Carlson cottage. I have no opinion as to whether Burke was the tenant of that cottage. I have an opinion as to whether O'Sullivan made a contract with Dr. Cronin for his professional services, and as to whether he made that contract for the purpose of using it as a scheme to entice the Doctor away to be murdered. Also as to whether the Doctor was taken from his home by the horse and buggy engaged at Di-

nan's livery stable by Coughlin, and as to whether Coughlin knew, when he hired the rig at that stable, that it was to be used to take the Doctor away to be murdered. Also as to whether the Doctor was killed in pursuance of a conspiracy, and whether Coughlin, O'Sullivan and Burke were members, of that conspiracy. Am not so sure that Kunze was a member of the conspiracy; I do not feel the same way about him. I have not felt sure that the Doctor was tried by a committee of Camp 20. I have sometimes thought there was no real trial but only an apparent one. I have an opinion that there was a sort of a trial there. I have an opinion that the Doctor was put to death in pursuance of the finding at such trial. I presume I have expressed these various opinions, and that my friends and acquaintances generally know what they are.

As it is now, I have a prejudice against the members of Camp 20. I would not refuse to believe members of Camp 20 under oath as witnesses merely because they were members of it. I have a prejudice against them only from what I have read.

In reply to questions put to him by the state's attorney, he said: I understand that there is a legal presumption that every defendant placed on trial is innocent until his guilt is proved in court, and that he can be convicted only, if at all, upon evidence adduced in court in his presence and in the hearing of the jury; that nothing else must weigh in the juror's mind except the evidence heard in court and the law, and I suppose that to hang a man on anything else would be equivalent to lynch law. I think, with my own knowledge of my own mental and moral make-up, that, if sworn as a juror, I could render a fair and impartial verdict in this case based exclusively upon the law and the evidence.

The court thereupon examined the juror as follows:

Q. Are you conscious at this time of any inclination to find this verdict one way or the other?

A. I have an inclination to find it of course from what I read; I am prejudiced against them.

Q. That is what I mean; I mean to say, sitting here as a juryman, would you have an inclination to find this verdict otherwise than according to the evidence?

A. Why, I think that I could decide according to the evidence. I feel in this way about it, not having heard anything except the newspaper evidence, I have a prejudice as it is. If there was evidence introduced to show that these parties were innocent, I think that I could give them the benefit of the doubt in that case and decide according to the evidence. There is that prejudice, a sort of feeling I can not explain, that I have.

Q. Perhaps I could state it in this way to find out your attitude in this matter: These men, according to the law, are presumed to be innocent for the reason that they have had no trial; there has been no sworn evidence against them; they have never seen the witnesses against them. The witnesses, when they were testifying, if they have ever testified anywhere, have never been cross-examined. It has been an *ex parte* examination before the grand jury and it resulted in an accusation, nothing but an accusation, not estimated in the law beyond that, except as a mere charge, a formal pleading. This is the first time these men have ever been brought to trial, and they are to be tried now upon the evidence of sworn witnesses brought here to confront them. We want to try the case also before twelve fair men, men who are willing to act upon that presumption of innocence, that is to say, will consider them innocent all through this case until there is evidence enough to convict them; who will listen to the State's evidence and listen to the defendants' evidence fairly and impartially, and bring in a verdict warranted only by the evidence and based solely upon the evidence. Could you sit here as one of the twelve men and do that kind of thing?

A. I think I could.

Q. Would you have an inclination to do otherwise than bring in a verdict according to the evidence?

A. Well, I have the inclination, I might change my inclination.

Q. If you have an inclination at this moment to bring in a verdict on anything but the evidence you are not a fair juror — if you have an inclination that you are disposed to find a verdict otherwise than warranted by the evidence ?

A. No, I am not disposed to do that. I would found it wholly upon the evidence.

Q. You mean by that word inclination, that you have from your newspaper reading of course some impression which may be unfavorable ?

A. Yes, sir, that has expressed it.

Q. Would those opinions or impressions in any manner influence you here now, when you are sworn here to the solemn duty to try this case on the evidence ?

A. No, sir.

Q. Are you certain of that ?

A. Positive of that.

Q. No matter what you have read; no matter what impression you have entertained; no matter what prejudice you have imbibed, these men, like all your fellow citizens who are accused of crime, are entitled to a trial before twelve men who will give them a fair trial. You realize that ?

A. Yes, sir.

Q. They are entitled to that presumption of innocence, which of course practically amounts to this, that they are innocent until evidence is brought into this court to convict them, of a proper character. Would your opinion strengthen the evidence of the State, any opinion which you entertain, or would you simply found your opinion, which should be your verdict, upon the evidence which you hear in court, treating what you have read as useless for this trial?

A. Well, sir, I hardly know how to answer that. I can not help feeling that, as Mr. Moore has said here the same way, that it would require evidence to change my opinion as it is

now, but if there were testimony introduced to convince me that the men were innocent of this thing, I would certainly acquit them in spite of the prejudice.

Q. Suppose the State introduced no evidence regarding the horse and buggy, that they introduced no evidence that is very good concerning this contract, and half a dozen other of these instances concerning which you have probably read, and the defendants introduced credible evidence, are you going to act —

A. No, sir, on the testimony they might give.

Q. Suppose they did not introduce any testimony and the State did not make much of a case?

A. Then I should have to acquit the men.

Q. You are all the time saying it would require some evidence to remove your opinion. If they introduced evidence to show their innocence, then of course you would act upon that. Do you appreciate the attitude you would be in, sworn as a juror, that these men would not be obliged to say anything at all, unless the State made out a case — they would not be called upon to introduce any evidence until the State had made a pretty strong case against them. If their counsel deemed their case was not very strong, they need not say anything, they could rely on your fairness and my fairness not to convict them on a weak case — not to require them to show their innocence. They could trust to the magnanimity of the law which considers them innocent until they are proved guilty?

A. Your honor, it does not seem possible for anybody to go with the jury without having this feeling I have, and it don't seem to me that, because a person is sworn, that they can banish all this prejudice they have and immediately say they have no opinion and believe the men innocent.

Q. If you said you believed them innocent to-day, I would have to let you go on the challenge of the State. The whole question here is, whether or not you are capable of that degree of fairness, of that judicial consideration of that matter, that you can sit here and say: " This is a trial of my fellow citizens,

brought here upon an accusation of the State.  I do not know whether they are guilty or not.  I shall only find them guilty when there is evidence of sufficient credible character to convince my mind in an unprejudiced condition, beyond all reasonable doubt, of their guilt "?

A. I believe I can feel that way.

The juror was then examined by counsel for the People as follows:

Q. Does this statement of yours, that you have an opinion that it would take evidence to remove, mean anything more than, that you can not perform a miracle and change your mind without something to do it?

A. That is it.

Q. Notwithstanding that opinion in your mind, you believe you could render a fair and impartial verdict based exclusively upon the law?

A. I believe I could.

Benjamin F. Clark, being examined as to his competency as a juror by counsel for the People, testified: I have an opinion as to the guilt or innocence of these defendants, based upon what I have read, and nothing else.  I read the papers very attentively, read very thoroughly evenings.  I understand that the law presumes a defendant placed on trial to be innocent until his guilt is established beyond a reasonable doubt.  I presume I approve of that principle of law, and if taken as a juror, notwithstanding any opinion derived from my newspaper reading I would render a fair and impartial verdict, based upon the law and the evidence.

In answer to questions put to him by counsel for the defendants, he testified: I have read the Chicago newspaper accounts of the commission of the crime for which these men are on trial, the murder of Dr. Cronin.  I have seen in those accounts the names of defendants Burke, O'Sullivan, Coughlin and Kunze.  I have read the newspapers continuously, daily I should say.  I take the Tribune regularly, and the Tribune, Times, Inter-Ocean

and Herald Sundays. These are the papers I read, and the News occasionally. I have read the articles about this case very carefully, and studied them very closely. I have given considerable thought to the subject. I have read the testimony that was given at the coroner's inquest; also the testimony that was heard at Winnipeg; and what purported to be the testimony given before the grand jury. I have frequently discussed the questions of the guilt or innocence of the defendants with my acquaintances. I have analyzed and compared what was said in the public newspapers to be the evidence in the case. I presume I have commented on the evidence in talking with friends. In those discussions I have heard opinions in relation to the guilt or innocence of these men on trial expressed. I think I have expressed such opinions.

I have now an opinion as to whether Burke, O'Sullivan and Coughlin are guilty or innocent. I haven't given so much thought as to whether Kunze was guilty or innocent as I have to the others. My opinions respecting the guilt or innocence of Burke, Coughlin and O'Sullivan are pretty firmly held. I have no reasonable doubt of their correctness. I think I have expressed those opinions. I think some of my friends and acquaintances know what my opinions are on that subject. It would require evidence to remove those opinions.

I have an opinion that Dr. Cronin was killed in pursuance of a conspiracy. I have an opinion that Burke, O'Sullivan and Coughlin, each and all, were members of that conspiracy. That opinion is pretty firmly held like the others. I have an opinion as to whether Dr. Cronin was killed at the Carlson cottage; and as to whether Martin Burke was a tenant of that cottage; and as to whether O'Sullivan made a contract with Dr. Cronin last spring for his professional services; and as to whether he made that contract for the purpose of using it as a scheme to entice the Doctor away to be murdered; and as to whether the Doctor was taken away from his house on May 4th by a horse and buggy hired at Dinan's livery stable by Coughlin;

and as to whether Coughlin knew, when he hired the horse and buggy, that it was to be used for the purpose of taking the Doctor away to be murdered. I have an opinion as to whether the Doctor was tried by a committee of Camp 20 last spring ; and as to whether he was put to death in pursuance of the finding of that committee.

I have a prejudice against the Clan-na-Gael society, only as it has been brought to my mind in reading this evidence. I never heard of this society before the 1st of May last. I have a prejudice against the members of Camp 20 of that society. I think that prejudice would lead me to refuse to believe under oath members of Camp 20 testifying in behalf of these defendants to facts which, if true, would show their innocence, these defendants also being members of that Camp. I hardly think I could begin this trial by presuming these men to be innocent.

On further examination by counsel for the People, he said : I have stated that, if taken as a juror in this case, I could render a fair and impartial verdict based exclusively on the law and the evidence, notwithstanding my opinion. I have no doubt about that.

Q. Would you treat the testimony of members of Camp 20 of the Clan-na-Gael the same as you would any other witnesses, up to the time it appeared that the Clan-na-Gael or that Camp had anything to do with this matter ?

A. I may have an opinion prejudiced against them, against their views.

Q. Would you allow that to affect your criticism in scrutinizing and weighing the evidence ?

A. Well, I do not know that I could help its prejudicing me somewhat.

Q. I want to know whether you treat their testimony any different from the way you would treat anybody's testimony of equal character and equal intelligence and equal relationship to the defendants on trial — equal association with the defendants on trial, unless it appeared from the evidence here, that

Camp 20 had something to do with this crime, or was in itself an unlawful combination; would you treat them any differently from the manner in which you would treat any other witness, unless those facts appeared?

A. I am afraid I would have to; I am prejudiced against that combination.

This is upon the understanding that it is an unlawful or criminal combination. Unless that appeared in the evidence, I think I would be able to cast that aside and give my verdict according to the law and the evidence in the case.

The court thereupon examined the juror as follows:

Q. Mr. Clark, all witnesses, when they come to the witness stand and are sworn, their credibility is in the hands of the jury, that is to say, the jury have a right to determine whether they are to be believed, from their association, their interests, their surroundings and manner of testifying — all those things which in ordinary life, go to make up the question of a man's honesty or dishonesty, his credibility or discredibility. You have the right, of course, as to every witness, when he comes to the stand, to discredit him, if you believe, upon his interest, if he seems to have any, or upon his lack of truthfulness, if he seems to lack that quality, and in every respect take into consideration everything that surrounds him; but you have no right, of course, to disregard a man simply because he belongs to some particular society or some particular race or some particular nationality, or anything of that kind, prior to the time that some evidence was introduced to show that he belonged to a criminal combination, or prior to the time that some evidence was introduced to show that the man was a man whose veracity was not ordinarily credited by the people, or some other thing of that kind, which would give you a right to take his testimony with allowance, or perhaps under the circumstances, the question which is put to you about this testimony is a narrow one; you must answer it as narrowly as it is put to you: Whether or not you would refuse to believe members of

Camp 20, testifying in behalf of these men, simply because they are members of Camp 20. That is the question. Would you do so, or would you treat their testimony, in view of the other remark of the court, in the light of their entire surroundings?

A. Well, that might be a prejudice, it would be hard work for me to get over that prejudice, Judge.

Q. Your prejudice against the organization itself?

A. Yes, sir, as an organization.

Q. I can not say, of course, that is for you to determine entirely. I can not determine that; I do not know anything about it. I only know this, that if taken as a juryman, you ought not to act upon any prejudice or upon any opinion. I am certain about that, and I want to be very certain that you would not, before I would be willing to let you qualify as a juryman. The question is, whether or not you would discredit, I mean, refuse to believe these men, simply because they have joined this organization, and belong to that Camp?

A. I think I should throw my prejudices aside and decide upon the law and the evidence as it was given, so far as I was able to. I am strongly prejudiced now.

Q. Strongly prejudiced against that organization, that is true. It is like a great many other prejudices; it may be invented; I don't know anything about that. I wont know until you get through with this case. Certainly you ought not to act upon anything except what you hear in this case?

A. I should certainly try to give my decision in accordance with that.

Q. You would not do that, as I understand you to say, you would not do that. Do you believe then — I take it, you believe, from what you said in your last answer, that you would, if taken as a juryman, be able to render a fair and impartial verdict on the law and the evidence?

A. I should endeavor to do so, certainly.

Q. Do you believe you could?

A. I do not know, Judge, whether I would want to say that I could or not.

Question by counsel for the People : Are you in any different state of mind, Mr. Clark, now, from the state of mind you were in when you told me you had no doubt of your ability — that you could do it?

A. Well, the question has been put in a little different shape, has it not?

By the court : In what respect is it different?

A. I want to convey this idea, that I am strongly prejudiced. I would get away from my prejudices if I could. If I was serving on this jury, I certainly shall try to throw aside prejudice and give my decision on the law and the evidence as presented to me.

Q. You of course have reflected somewhat on the principles which govern the administration of criminal law, probably you have?

A. Somewhat, yes, sir.

Q. That is, that these men are presumed to be innocent, as you would be, as I would be, as anybody else would be, were they brought into court to be tried on an accusation of crime, after an indictment found by the grand jury, because prior to that time, there has been nothing but an *ex parte* hearing, and a very hurried one sometimes, before the grand jury, and it has resulted in an accusation. For the first time now, these particular men here are brought into court to be tried upon that indictment. They are entitled to be tried upon the legal presumption of innocence. The practical effect of that presumption is, that the State carries the burden of proof, and must introduce evidence here sufficient to prove their guilt, and that must remain even after the defendants introduced their evidence, there must be a balance so strong in favor of their guilt, as to leave no reasonable doubt in the minds of the jury, after it is all in, that they are guilty, before any action can be taken. So the legal principles are, that the presump-

11—144 ILL.

tion of innocence which prevails practically for the purpose of making the State bring in evidence against them and carry the burden all through, that is, the State must carry the burden, and the men are entitled to acquittal, if the State can not make that sort of a case against them.    Don't you believe that, sitting here as a juryman, feeling the full responsibility of your position as a juror trying your fellow citizens for a grave matter, where their lives and liberty are in jeopardy, that you would act according to these legal principles, and render a fair and impartial verdict, based alone upon the evidence and the law ?

A. I think I could; yes, sir, I should try to.

Q. When you were interrogated by Mr. Forrest, you replied to him that you had no reasonable doubt about the correctness of the opinion which you had formed.    The court wants to know if you mean by that, that you have no reasonable doubt regarding that, providing the facts stated in the papers were true ; if it were a hypothetical opinion you mean, that is an opinion based upon the possibility or probability even of the facts as stated in the paper.

A. The statement in the paper is all I have to found an opinion upon.

Q. When you say you have no reasonable doubt, did you mean that if the statements were true, then you had no reasonable doubt?    Is that what you meant?

A. Certainly.

Q. And nothing else?

A. Yes, sir.

Upon the foregoing examination of these jurors the court held that the competency of each was established, and overruled the challenge for cause interposed to each by Coughlin and certain of his co-defendants, and the jurors were sworn and formed a part of the jury before which the trial was had.    Exceptions to these rulings were duly preserved, and Coughlin now assigns them for error.    The propriety of these

rulings constitutes the only question we feel called upon to consider.

The original Constitution of this State adopted at the time the State was admitted into the Union, provided that, in all prosecutions by indictment or information, the accused should have a right to " a speedy public trial by an impartial jury," and in both the subsequent revisions of the Constitution, viz., that of 1848, and that of 1870, the one now in force, the same provision has been retained, and it is now, as it has been ever since the State has had an existence, a part of our fundamental law.   The same provision is found in the Constitution of the United States, and, as we may presume, in those of most if not all the States of the Union.   With us, it is found in what is known as the Bill of Rights, in which this and many other of the provisions declaratory of the fundamental principles of human rights, and of free and just government, which have come down to us from the great charter of English liberty, are gathered up and made a part of our constitutional law.

In the legal and constitutional history of England the term "impartial jury" has received a fixed and definite meaning, and the term having been borrowed from the common law as it had existed there for ages, it must be deemed to have been adopted in view of the recognized and well understood meaning which had thus been fixed upon it.   *Eason* v. *The State,* 6 Baxter, 466.   The Constitution must be construed as guaranteeing to every defendant in a criminal prosecution a trial by an "impartial jury," as that term was understood at common law.

It was a cardinal rule of the common law that juries, to be impartial, should stand indifferent between the parties.   The rule is laid down by Lord Coke, that he that is of the jury must be *liber homo*, that is, not only a freeman and not bound, but also one that hath such freedom of mind that "he stands indifferent as he stands unsworn."   Coke Litt., 155a, note d. "It is essential that every juryman should be wholly free,

even from the suspicion of bias, and be *omni exceptione majores.*" *Dauncey* v. *Berkeley,* cited in 3 Chit. Gen. Prac., 795. As said in *Hesketh* v. *Braddock,* 3 Burr. 1847 : " The law has so watchful an eye to the pure and unbiased administration of justice, that it will never trust to the passions of mankind in the decision of any matter of right."

Challenges to jurors, based upon an allegation of bias, favor or partiality, were, at the common law, divided into two classes, viz., principal challenges and challenges to the favor. A principal challenge was grounded on such manifest presumption of partiality, that if the fact alleged was proved to be true, the disqualification of the juror followed as a legal conclusion, incapable of being rebutted. In case of a challenge to the favor, on the other hand, the disqualification arose as a conclusion of fact to be determined by the triers, the evidence adduced in support of the challenge leading to no presumption which might not be overcome by other evidence.

Among the various matters which, at common law, were held to be principal cause of challenge, that is, cause from which bias or partiality would be inferred as a legal conclusion, were these : consanguinity or affinity of the juror with either of the parties within the ninth degree; that the juror was god-father to the child of either party, or *e converso ;* that the juror was of the same society or corporation with either party ; or was tenant or " within the distress " of either party ; or had an action implying malice depending between him and either party; or was master, servant, counsellor, steward or attorney for either party ; or after he was returned, he ate and drank at the expense of either party ; or had been chosen as arbitrator by either party. By most of the authorities it was held to be ground of principal challenge, that the juror had formed and declared his opinion touching the matter in controversy. 5 Bac. Abridg., 353; 3 Black. Com., 363 ; 2 Tidd's Prac., 853; Coke Litt., 155; 3 Burns' Justice of the Peace (28th Ed.), 519; 21 Viner's Abridg., 252 ; 1 Chit. Crim. Law,

541 ; 3 Chit. Gen. Prac., 794 ; *Pringle* v. *Hulse*, 1 Cow., 436, note 1 ; *People* v. *Bodine*, 1 Denio, 304. According to these authorities and others like them, where the matter alleged was held to be ground for principal challenge, all the challenging party was called upon to do was, to prove the existence of the fact alleged by him as a ground of challenge, and that being shown, the incompetency of the juror followed as a necessary legal consequence, and in such case, no inquiry was permitted as to whether, notwithstanding the fact shown, he could sit as a juror and render a fair and impartial verdict. The law, from the fact proved, conclusively presumed bias, and permitted no further inquiry.

In this State, triers are not appointed, according to the mode of procedure at common law, all challenges, by our practice, being determined by the court. Nor has the common law distinction between principal challenges and challenges to the favor been kept up in this State, still many of the principles growing out of that distinction have been habitually recognized and enforced. Indeed, most of the objections to jurors which at common law were held to be ground of principal challenge, are held with us to be absolute disqualifications, that is, upon mere proof of the fact alleged, the disqualification follows as a legal conclusion, and evidence is not admitted to show that, notwithstanding the fact proved, the juror is really impartial.

In view of the principles discussed thus far, two inquiries legitimately arise in the present case, 1, whether the facts proved in relation to the jurors challenged constituted disqualifications *per se*, and 2, if they must be held to be such as raise only a *prima facie* presumption of bias or partiality, whether, in view of all the evidence adduced upon the hearing of the challenges for cause, the court was justified in deciding that the jurors were competent.

In 5 Bacon's Abridgment, 353, it is laid down as a principal cause of challenge that a juror " has delivered his opinion

touching the matter." So, in *Blake* v. *Millspaugh*, 1 John., 316, it was held that a juror who had previously given an opinion on the very question in controversy was incompetent. "If one has expressed an opinion upon the prisoner's guilt, it is good ground of challenge for principal cause." *Greenfield* v. *The People*, 74 N. Y., 277. The cases in this country are numerous where the formation and expression of an opinion as to the merits of the controversy is held to be a disqualification *per se.* There are also many cases where the mere formation of such opinion, though not expressed especially if it appears that evidence will be required to remove it, is held to be such disqualification. Among the numerous decisions of this character in the other States, the following may be cited : *Palmer* v. *The State*, 42 Ohio St., 596 ; *Polk* v. *The State*, 45 Ark., 165 ; *Stephens* v. *The People*, 38 Mich., 739 ; *Brown* v. *The State*, 57 Mis., 424, and numerous cases there cited ; *Brown* v. *The State*, 70 Ind., 576 ; *Dugle* v. *The State*, 100 ib., 259 ; *Goodwin* v. *Blachley*, 4 ib., 438; *Stare* v. *Rocks*, 22 La. An., 1038 ; *Miller* v. *The State*, 29 Neb., 437 ; *Owens* v. *The State*, 32 ib., 167 ; *Myers* v. *Commonwealth*, 79 Penn. St., 308 ; *State* v. *Coella*, 2 Wash. St., 99 ; *State* v. *Culler*, 82 Mo., 623; *Vance* v. *The State*, 19 South Western Rep., 1066.

But in view of the importance of the questions before us, and of the desirability of arriving at a perfectly correct understanding of the rule on this subject as it has been administered in this State, it may not be amiss to attempt a somewhat comprehensive review of the decisions to be found in our own reports, having any material bearing on the subject. It will be found, we think, that at an early period of our judicial history, a wise and conservative rule was announced, sufficiently definite to insure to the accused a trial by an impartial jury, yet sufficiently flexible to meet the ever varying conditions which may arise in the administration of justice; and that the rule thus formulated has been consistently and firmly applied and adhered to ever since, and is now, except perhaps so far as it

has been modified by our recent statute, the law by which we are governed to-day.

The first case in which the competency of a juror who had formed an opinion was considered was *Noble* v. *The People*, Breese, 54. The report of that case shows merely that the juror had formed an opinion, but had not expressed it, and the court, in holding him not disqualified, said : " The law and Constitution provide that all men shall be tried by an impartial jury; but, as the mind of man is organized, it is almost impossible for a jury to be perfectly impartial. Slight impressions will appear on the mind of any person who will at all think of any subject. This is unavoidable. These impressions will go on step by step on the mind, until they are confirmed into complete opinions. Yet the law can not draw any distinctions between the most hasty impressions and a confirmed opinion ; therefore all these grades of opinion must be treated alike, and ought not to disqualify the person from acting on the jury. It is quite a different thing when these opinions are expressed. Every person wishes to appear to the world consistent ; therefore there is a strong partiality for those opinions when expressed, so much so, that it disqualifies a person so situated from acting on a jury."

The value as an authority of the remarks here quoted is very much impaired by the meagerness of the report of the facts upon which they are based. Nothing is stated tending to show the strength of the juror's opinion, or as to whether it was fixed and settled or otherwise. Nor does it appear whether the opinion was as to the guilt or innocence of the accused, or as to some collateral fact. Bearing in mind the rule that the party, interposing the challenge has the burden of sustaining it by proof, it is clear that, if the report states all the facts shown by the evidence, the decision holding that the impartiality of the juror had not been successfully impeached was clearly correct, wholly regardless of whether a fixed and settled opinion as to the guilt or innocence of the accused would have

been a disqualification or not.   The juror's opinion, so far as ap-
pears, may have been but slight, or only hypothetical, and so
not amounting to a disqualification under any rule applicable
to the subject, and a decision of the question as to what
might have been the result, if the juror's opinion had been so
far fixed and settled as to be likely to influence his action as a
member of the panel, so far as we can gather from the report,
was not called for.

The question next arose in *Smith* v. *Eames*, 3 Scam., 76,
where it received a full and careful consideration, and the de-
cision there rendered has been the leading authority on the
subject from that time to the present.   In that case, a juror,
being examined on his *voir dire* by the defendant's counsel,
testified that he had both formed and expressed an opinion in
relation to the right of the plaintiff to recover.   On examination
by the plaintiff's counsel, he testified that he had formed his
opinion from rumor ; that he did not know who the witnesses
were ; that he still entertained his opinion if what he had heard
was true, but he was not asked whether he believed the rumors
to which he referred.   The trial court held him to be compe-
tent, and this court affirmed that decision.   In the opinion,
which was delivered by Mr. Justice BREESE, it was said :

" A juror is disqualified if he has expressed a decided opinion
upon the merits of the case.   If, without any qualification
whatever, a juror says that the defendant is guilty, or the like,
or that the plaintiff ought to recover in the action, or that the
verdict ought to be against the plaintiff, he would be disqualified,
as not standing impartial between the parties.   If, on the con-
trary, a juror says that he has no prejudice or bias of any kind
for or against either party ; that he has heard rumors in rela-
tion to the case, but has no personal knowledge of the facts ;
and, from the rumors, he has formed and expressed an opinion
in a particular way, if they were true, without expressing any
belief in their truth, we should think he would not be disquali-
fied.   By hearing reports of a case, not from the witnesses, nor

from the parties, but from common fame, and making up an opinion upon them, the juror has not prejudged the case, unless the case should turn out to be precisely as the rumors were, a thing very improbable ; but he has adjudged only the rumors, varying in their hue and color as they circulate through the country. The human mind is so constituted that it is almost impossible, on hearing a report freely circulated in a county or neighborhood, to prevent it from coming to some conclusion on the subject; and this will always be the case while the mind continues to be susceptible to impressions. If such impressions become fixed, and ripen into decided opinions, they will influence the man's conduct, and will create necessarily, a prejudice for or against the party towards whom they are directed, and should disqualify him as a juror."

Again : " If a person, without any knowledge of the facts, upon the faith of mere rumor alone, forms a decided opinion, and is convinced, without any evidence, he is not fit to judge his fellows. But if, in obedience to the laws of his organization, his mind receives impressions from the reports he hears, which have not become opinions fixed and decided, though they may seem to be at first, he would not be disqualified."

Then, after reviewing various authorities, the opinion proceeds: " We lay down this rule, that if the juror has made up a decided opinion on the merits of the case, either from a personal knowledge of the facts, from the statements of witnesses, from the relations of the parties, or either of them, or from rumor, and that opinion is positive, and not hypothetical, and such as will probably prevent him from giving an impartial verdict, the challenge should be allowed. If the opinion be merely of a light and transient character, such as is usually formed by persons in every community, upon hearing a current report, and which may be changed by the relation of the next person met with, and which does not show a conviction of the mind, and a fixed conclusion thereon, or if it is hypothetical, the challenge ought not to be allowed."

Since the decision in *Smith* v. *Eames* was announced, the rule stated in the paragraph last quoted has been referred to and followed and has been accepted as the settled law, and it must be now so regarded, except so far as it has been modified by the fourteenth section of the act of 1874 in relation to Jurors. The first case in which it was cited and applied was *Gardner* v. *The People*, 3 Scam., 83. There several jurors, to whom a challenge for cause was interposed, testified on their *voir dire* that they had formed and expressed opinions as to the guilt or innocence of the prisoners from reports; that they had heard none of the witnesses nor any person who professed to know the facts detail them; that they had no reason to believe or disbelieve the reports more than any other reports that float through the neighborhood, and that the opinions they had expressed were, that if the reports were true, their opinions were as they stated. On applying the foregoing rule, these jurors were held to be competent.

In *Sellers* v. *The People*, 3 Scam., 412, a juror, a short time prior to the trial and on different occasions said, that he believed the prisoner "would be hung; that he ought to be hung ; that nothing could save him ; that salt could not save him, and that there was no law to clear him;" and subsequently went to the jail and told the prisoner that he ought not to be hung, and if he were on the jury he would not be hung. The court, quoting what was said in *Smith* v. *Eames*, viz., that " if without any qualification whatever, a juror says that the defendant is guilty," or the like, he is disqualified, held the juror incompetent.

In *Vennum* v. *Harwood*, 1 Gilm., 659, the jurors, in answer to questions put to them by counsel for the defendant, severally declared that they had neither formed nor expressed an opinion relative to the rights of the parties or merits of the case. They were all accepted and sworn without challenge, and a verdict being rendered in favor of the plaintiff, the defendant, on motion for a new trial, proved by the affidavits of

witnesses, that one of the jurors, before the trial, had declared, among other things, that the plaintiff ought and would recover heavy damages against the defendant. The motion for a new trial having been denied, this court, on appeal, held that, under the rule laid down in *Smith* v. *Eames*, the juror was incompetent, and for that reason the judgment was reversed and a new trial awarded.

In *Baxter* v. *The People*, 3 Gilm., 368, a juror, when first examined, stated that he had formed and expressed an opinion from reports, a part of which he believed. When further examined, he stated that the opinion he had formed was on the hypothesis that the rumors were true, only a part of which he believed ; in fact, he had no opinion whether the rumors which he had heard were true or false, and that the opinion he had formed was not of a fixed and definite character. This court, in holding the juror competent, remarked that the objection was not as strong as that appearing in *Smith* v. *Eames*, and in further elucidation of the rule in such cases, it was said : " It seems sufficient if the judgment of the juror is convinced; if his belief is established from facts, of the truth of which he has no reasonable doubt, of the guilt or innocence of the accused, or that one party or the other should recover. Has the existence of certain facts been so established in his mind as to produce conviction. If so, he is incompetent, for neither party should be put to the necessity of producing proof to remove a preconceived opinion. If the juror is ready to respond to the question, ' Is the prisoner guilty, or is he innocent ? ' then he is incompetent. But if from not being convinced of the existence or non-existence of certain facts, he is unable to determine that question, then he is competent."

In *Neely* v. *The People*, 13 Ill., 685, one juror testified that he had heard statements which he then believed and still believed to be true, and from those statements had formed an opinion ; that if the evidence should turn out as he had heard, he had an opinion, but if the evidence should be different, he

would be governed by the evidence in finding a verdict. A second juror testified that he had formed an opinion from statements he had heard, and that those statements came from such a source that he believed them to be true. A third juror testified that he had formed an opinion from statements he had heard; that he believed the statements he had heard to be true, but did not know whether he heard them from witnesses or not; that he should believe them until disproved, but that if the contrary was proved, he did not know that the opinion formed would influence him. A fourth juror testified that he had frequently heard the case spoken of; that he was at the town where the examination before the justice of the peace was had shortly after the examination; that he had been told by one person present what the evidence in the case was; that he had heard statements in regard to the case from one of the counsel in it; that he had formed an opinion from the statements he had heard, and he believed them to be true; that if the evidence should turn out as he had been told, he had an opinion, but if not, then he had no opinion; that he had not formed such an opinion as would prevent him, after hearing the evidence in the case, from rendering a fair and impartial verdict. Each of these jurors testified that the opinion he had formed was as to the guilt or innocence of the defendant. This court, under the rule announced in *Smith* v. *Eames*, held all these jurors incompetent, saying : " Each of the jurors had formed a definite opinion as to the guilt or innocence of the prisoner, based upon information as to the facts of the case which he believed to be true. His opinion was of a positive and not of a hypothetical character. He would have entered the jury-box with a fixed opinion as to the question to be determined, that would have controlled his action as a juror, unless the testimony disclosed a state of facts materially different from what he had already believed to be true."

In *Thomson* v. *The People*, 24 Ill., 60, a juror testified that he had conversed with a witness in the case, and had

formed an opinion as far as he had heard, but had not formed an opinion as to the guilt or innocence of the prisoner. It was not shown as to what the opinion of the juror related, or whether it involved in the least the merits of the controversy. The juror was held to be competent.

In *Gray et al.* v. *The People*, 26 Ill., 344, a juror stated that he had read about the case in the newspapers; that he did not know the defendants; that he believed the reports that there was a house-breaking; that if the defendants were the persons named in the papers, he had an opinion as to their guilt or innocence; that one of the persons named in the newspapers might have been Gray, and if it should turn out that that person was one of the defendants, he should have an opinion as to their guilt or innocence. He further stated that he had not formed and expressed an opinion as to the guilt or innocence of the defendants; that he had in his mind no bias or prejudice, and could give the defendants a fair trial according to the evidence. The juror was held disqualified, under the rule laid down in *Smith* v. *Eames.*

In *Collins et al.* v. *The People*, 48 Ill., 145, five jurors who were accepted by the court and who formed a part of the panel which tried the case, stated on their *voir dire*, that they had heard the circumstances of the difficulty; that they believed the statements, and upon such statements had fixed opinions as to the merits of the case, such as would require evidence to remove or change, but that those opinions could be changed by sufficient evidence; that they had no prejudice against the accused, and they believed they could render a fair and impartial verdict according to the evidence. In the decision of this court holding these jurors incompetent, it was said: "It has been repeatedly held by this court, that if a juror has a decided opinion respecting the merits of the controversy, either from a personal knowledge of the facts, from the statements of witnesses, from the relations of the parties, or from rumor, he is disqualified from trying the case, if challenged for cause.

(Citing *Smith* v. *Eames, supra,* and the other cases following the rule there laid down). These cases must govern this case. A prisoner should never be required to encounter a pre-existing opinion deliberately formed, which the juror believes to be true, and which the prisoner would be obliged to overcome. When tried by such jurors, he can not be said to have had a fair trial, unless he choose to permit them to act in the case. He has a right to be tried by men who are wholly impartial, without prepossession or prejudice against him or his case. Tested by these rules, these jurors were incompetent, when objected to by the accused, and the court below erred in not allowing the challenges to these jurors."

In *Leach* v. *The People*, 53 Ill., 311, two jurors were challenged by the defendant, who stated that they had partially formed opinions from what they had heard and read, but it clearly appeared that those opinions were not fixed, and were merely hypothetical, and wholly dependent upon whether what they had heard was true. This court, in the opinion, cited the rule as laid down in *Smith* v. *Eames*, and held that the challenges were properly overruled.

*Davis* v. *Walker*, 60 Ill., 452, was a suit brought to recover damages under the act of 1867 forbidding the introduction of Texas or Cherokee cattle into the State. A juror, on his examination, testified that, in his opinion, Texas cattle would communicate disease to native cattle, whether diseased themselves or not. A challenge to the juror was overruled, and this court, in holding that decision to be erroneous, said : " The juror entered the box with an opinion already formed upon one of the main issues involved in this controversy. That the plaintiff's cattle died not long after a herd of Texas cattle passed along the road to defendant's farm was not denied. The question to be determined was whether the disease which killed them was derived from the Texas cattle or produced by some other cause. If a juror had already a fixed opinion that a deadly malady walked in the footsteps of Texas cattle, though

free from disease themselves, it is clear he would most unavoidably attribute the death of the plaintiff's cattle to that cause which he was already satisfied would produce the result, no other cause being positively shown."

In *Lycoming Fire Ins. Co.* v. *Ward,* 90 Ill., 545, a juror had heard a part of the evidence in a suit by the same plaintiff against another insurance company, which had just been tried, and in which the questions involved were similar to those at issue in the case which the juror was called to try. It did not appear that he had formed any fixed or decided opinion, and this court, citing and applying the rule laid down in *Smith* v. *Eames* held that he was competent.

In *Gradle* v. *Hoffman,* 105 Ill., 147, the juror challenged, stated on his *voir dire* that he had read an account of the case in the newspapers, but remembered no part of what he had read ; that the account made no impression on his mind ; that he had then no impression and that no evidence would be required to remove one. He further said that if the evidence was equally balanced, it would be difficult to decide. This juror was held to be impartial and qualified, this court remarking that "such a juror would no doubt regard an instruction of the court as to his duty in case the evidence was evenly balanced."

In *C., B. & Q. R. R. Co.* v. *Perkins,* 125 Ill., 127, which was a suit brought to recover damages for the death of the plaintiff's intestate, one juror had heard of the accident at the time the deceased was killed and had heard people talk about the matter, but stated that he had no opinion in the case from what he had read or otherwise. This juror was held to be competent. Another said that he had an opinion in regard to which of the parties ought to succeed in the case, and to him a challenge for cause was sustained. This court held that he was not an impartial juror, and that the challenge was properly sustained.

*Plummer* v. *The People,* 74 Ill., 361, was the first case decided by this court in which reference is made to our present

statute in relation to Jurors. In that case one juror had heard rumors and formed an unfavorable opinion against the defendant, but did not think it would prevent his rendering a fair and impartial verdict. The opinion quotes the statute, and holds that under its provisions this juror was competent. Another juror was asked the question: "You think that you have heard reports which you believe to be true, in respect to the defendant, which would have a tendency, in some degree, to bias your mind in this respect?" To which he answered: "It may have." This juror was held to be incompetent, the court remarking: "Where a juror has been exposed to influences, the probable effect of which is to create a prejudice in his mind against the defendant, which would require evidence to overcome, to render him competent it should clearly appear that he can, when in the jury box, entirely disregard those influences, and try the case without, in any degree, being affected by them."

The foregoing are all the decisions in this State prior to the passage of our present statute, to which our attention has been called, and several of those of later date, bearing upon the question now under consideration. Taking them all together, it is plain that the rule in this State, except so far as it is modified by the statute, is perfectly well settled, that if a juror has made up a decided opinion upon the merits of the case, either from personal knowledge of the facts, or from the statements of witnesses, or from the relations of the parties, or from either of them, or from rumor, and that opinion is positive and not hypothetical, and is such as will probably prevent him from giving an impartial verdict, he is disqualified. No case can be found where a juror, after admitting the existence in his mind of an opinion of that character, has been permitted to establish his own competency by testifying that, notwithstanding his opinion, he can or will render a fair and impartial verdict. Such opinion has uniformly been held to be a disqualification *per se*, and is incapable of being removed by

the testimony of the juror or other evidence tending to show that it will not affect his verdict. A decided and positive opinion as to the merits of the case, raises such manifest presumption of partiality as at common law would constitute a principal cause of challenge. The incompetency of the juror follows as a necessary legal consequence, which is incapable of being rebutted. And so, in all the cases above referred to, where such fixed and positive opinion is shown, and the juror testified that, he could nevertheless render a fair and impartial verdict, such testimony of the juror has been wholly disregarded, and he has been held to be incompetent, in spite of his own assertion of his impartiality. Such was the case in *Neely* v. *The People*, 13 Ill., 685 ; *Gray et al.* v. *The People*, 26 ib., 344, and *Collins et al.* v. *The People*, 48 ib., 145.

In *Winnesheik Ins. Co.* v. *Schueller*, 60 Ill., 465, which was a suit against an insurance company upon one of its policies for a loss by fire, a juror challenged stated that he had some prejudice against insurance companies generally ; that his prejudice was founded on the fact that he could not comprehend their proceedings, but he testified that his prejudice would not affect his verdict. He was held to be incompetent, and his assertion that his prejudice would not affect his action as a juror seems to have been regarded as wholly unimportant, as it was not commented upon. But in the opinion it was said : "A juror should stand indifferent between the parties. No bias should influence his judgment and swerve him from strict impartiality. It would have required as much evidence to remove his unfounded prejudice as to convince him of the justice of the defense. The juror said that he had no more prejudice against this than any other company, but that he had a prejudice against all insurance companies. How is it possible that his mind would not be biased, and his determination, to some extent, influenced? It is not necessary that his unfavorable impressions should be so strong that they could not be shaken by evidence. It is sufficient if proof be necessary to restore his impartiality.

A party should never be compelled to produce proof to change
a preconceived opinion or prejudice which may control the
action of the juror."

The worthlessness of the testimony of a juror as to his own
fairness, after having disclosed a fixed and decided opinion as
to the merits of the controversy, or a strong inclination or bias
against or in favor of one of the parties, is well stated in *C. &
A. R. R. Co.* v. *Adler,* 56 Ill., 344. There several jurors who
tried the case were asked which way they would be inclined to
find, if the evidence were evenly balanced, and each answered
that in such case he would lean against the defendant, one of
them stating that he would do so because the railroad company
was able to stand it, and because he thought a private indi-
vidual should have a little the advantage. These jurors were
held to be disqualified, and in the opinion it was said: "Nor
does the fact that jurors, who avow, under oath, that they
would incline to favor a recovery by the plaintiff on evidence
evenly balanced, declare that they are impartial, in the slight-
est degree tend to prove their impartiality. Their statement
only tends to prove that they are so far lost to a sense of jus-
tice, that they regard what all right-thinking men know to be
wrong, as just and impartial. To try a cause by such a jury,
is to authorize men who state that they will lean in their find-
ing against one of the parties, unjustly to determine the rights
of others, and it would be no difficult task to predict, even be-
fore the evidence was heard, the verdict that would be ren-
dered. Nor can it be said that instructions from the court
would correct the bias of jurors who swear that they incline in
favor of one of the litigants."

The same view was taken by the Supreme Court of Michi-
gan in *Stephens* v. *The People,* 38 Mich., 739. There six of
the jurors stated that they had formed an opinion, from what
they had heard and from reputation, that the defendant was
guilty as charged in the indictment. On being asked whether
their opinions were of a positive character that it would be im-

possible for them to hear the testimony and decide impartially, they answered that they thought not. It was held that they were incompetent, and that it was useless to ask them whether they could render a just and impartial verdict. On this latter question the court said : "Under such circumstances, it is idle to inquire of the jurors whether they can return just and impartial verdicts. The more clear and positive were their impressions of guilt, the more certain they may be that they can act impartially in condemning the guilty party. They go into the box in a state of mind that is well calculated to give a color of guilt to all the evidence; and if the accused escapes conviction, it will not be because the evidence has not established guilt beyond a reasonable doubt, but because an accused party, condemned in advance, and called upon to exculpate himself before a prejudiced tribunal, has succeeded in doing so." To similar effect, see, *Owens* v. *The State*, 32 Neb., 167; *Miller* v. *The State*, 29 ib., 437; *Curry* v. *The State*, 4 ib., 548; *Cowan* v. *The State*, 22 ib., 519; *Olive* v. *The State*, 11 ib., 1; *Greenfield* v. *The People*, 74 N. Y., 277; *Dugle* v. *The State*, 100 Ind., 259; *Polk* v. *The State*, 45 Ark., 165; *Wright* v. *Commonwealth*, 32 Grat., 941; *Jackson* v. *Commonwealth*, 23 ib., 919; *Eason* v. *The State*, 6 Baxter, 466; *Goodwin* v. *Bacheley*, 4 Ind., 438; *Vance* v. *The State*, 19 S. W. R., 1066.

We have now reached the point where we may properly consider the question as to how far these well established rules have been modified by section 14, of chapter 78, of the Revised Statutes. That section declares that certain enumerated objections to petit jurors, not material here, shall be sufficient cause of challenge, and concludes with the following provisos :

"*Provided, further*, that it shall not be a cause of challenge that a juror has read in the newspapers an account of the commission of the crime with which the prisoner is charged, if such juror shall state, on oath, that he believes he can render an impartial verdict, according to the law and the evidence :

*And, provided, further,* that in the trial of any criminal cause, the fact that a person called as a juror has formed an opinion or impression, based upon rumor or upon newspaper statements (about the truth of which he has expressed no opinion), shall not disqualify him to serve as a juror in such case, if he shall, upon oath, state that he believes that he can fairly and impartially render a verdict therein, in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement."

The constitutionality of this statute was directly called in question in *Spies et al.* v. *The People,* 122 Ill., 1, and we there held it to be constitutional, and we are still disposed to adhere to the conclusion announced in that case. See also *Spies* v. *Illinois,* 123 U. S., 131. Similar statutes exist in several of the other States, and their validity seems to be generally conceded.

The only exception to this to which our attention has been called is the statute of Tennesee, which was held in *Eason* v. *The State,* 6 Baxter, 466, to be unconstitutional. By that statute, however, an opinion formed or expressed, touching the guilt or innocence of the accused, upon information derived exclusively from a published account of the facts of the offense charged, should not render the juror incompetent, unless the writer of the statement professed to have been a witness of the occurrence, provided, the juror would state that he believed he could give the accused a fair and impartial trial upon the law and the evidence. But in that statute there was no provision, as there is in ours, that to render the juror competent, the court must be satisfied of the truth of his statement, that, notwithstanding his opinion, he can give the accused a fair and impartial trial. If our statute had been so framed as to make the competency of the juror depend solely upon whether he could state that he could render a fair and impartial verdict, thus, in effect, making the juror the sole judge of his own competency, a very different constitutional question would

arise from the one now presented. As our statute is framed, the competency of the juror remains, as it was before, a judicial question, to be determined by the court from the evidence, and the court must be satisfied now, the same as before the statute was passed, of the impartiality of the juror, before deciding to overrule the defendant's challenge.

The validity of our statute then being assumed, we have only to determine its force and effect, as applied to the case before us. It must be conceded that the constitutional provision guaranteeing to every person accused of crime, the right to a trial by an impartial jury, has the same force since the statute as before. The statute therefore can be construed and enforced only in subordination to that provision. It can not be regarded as changing in any degree the essential qualifications which jurors must possess, but merely as furnishing a new test by which those qualifications are to be determined. It must, as a necessary consequence, be construed, not as derogating from, but so as to effectuate the constitutional requirement, viz., an impartial jury.

It makes the statement of the juror that he can render a fair and impartial verdict, according to the law and the evidence, competent, as bearing upon the question of his impartiality, and requires the court to hear and consider such statement, if the juror sees fit to make it, and the result therefore would seem to be, that the question of the competency of a juror, as affected by his opinions based upon rumor or newspaper statements must in all cases be treated as a question of fact. But the statute does not attempt to determine in the least what shall be the probative force of the statement of the juror when made, or how far it shall have the effect of relieving him of the disqualification arising from the existence in his mind of such opinion. The juror's statement becomes evidence, to be received and given such weight as, under all the circumstances appearing, it is fairly and justly entitled to. Before it can operate to remove the disqualification, the court must be satis-

fied of its truth, and that question is left to be determined from all the facts and circumstances appearing in evidence, under the guidance of those rules of evidence which exist independently of the statute.

In the review of the authorities we have already made, it has sufficiently appeared that, where the opinion of the juror is only slight or transient, or is hypothetical, very considerable reliance is placed upon his statement under oath, that his opinion is not of such character as will interfere with his action as a juror. Indeed, where the opinion is shown to be of that character, such statement is usually one of the most satisfactory tests of the juror's impartiality. But the holding of this and other courts is substantially uniform, that where it is once clearly shown that there exists in the mind of the juror, at the time he is called to the jury box, a fixed and positive opinion as to the merits of the case, or as to the guilt or innocence of the defendant he is called to try, his statement that, notwithstanding such opinion, he can render a fair and impartial verdict, according to the law and the evidence, has little if any tendency to establish his impartiality. This is so because a juror who is shown to have in his mind a fixed and positive opinion as to the guilt or innocence of the accused, is not impartial, as a matter of fact, to say nothing of those legal conclusions which formerly prevailed, and which would still prevail, if the statute were not in existence. His statement that he can render a fair and impartial verdict does not tend to show that he is not partial, since it does not tend to show the non-existence of the fixed and decided opinion to which he has already confessed. It merely tends to show that the juror, while admitting that he has prejudged the prisoner's case, believes in his ability to act as though he had not done so, or that, while admitting his actual partiality, he believes in his ability to act as though he were impartial. It being constantly kept in mind, that the fact to be proved by the juror's answer is, that he is impartial, in the constitutional sense of the

word, it is difficult to see how, after a juror has avowed a fixed and settled opinion as to the prisoner's guilt, a court can be legally satisfied of the truth of his answer that he can render a fair and impartial verdict, or find therefrom that he has the qualification of impartiality, as required by the Constitution.

In applying the foregoing principles to the facts before us, it is scarcely necessary to observe that, if the trial court was in error in overruling the defendant's challenge to any one of the jurors objected to, the judgment must be reversed. The defendants had a constitutional right to a trial by twelve impartial jurors, and so, if any one of the twelve was lacking in the requirement of impartiality, the defendants have not been tried by an impartial jury. We have therefore confined our attention to the objections raised to jurors Bontecou and Clark, although exceptions were taken to the decision of the court overruling the defendants' challenges to three other jurors.

As seems to us to be abundantly manifest from the examination of these two jurors given above at length, they both had in their minds fixed and settled opinions as to the guilt or innocence of the defendants, and among them, of Coughlin, the plaintiff in error. They also avowed fixed and settled opinions specifically in relation to the truth of most of the facts and circumstances alleged by the prosecution, and relied upon as tending to establish the guilt of the defendants. These facts as to which these jurors entertained fixed and settled opinions were not only material, but went to the very foundation of the case made by the prosecution, so that without proof of them, a conviction of the defendants would have been impossible, and the truth of all or nearly all of them was sharply contested at the trial, the evidence in relation thereto being in many respects conflicting, and calling for the exercise of the most impartial and unbiased judgment on the part of the jury. They also disclosed a prejudice against the defendants themselves, and against the members of a society to which they

belonged, a prejudice which they admit would have a tendency to affect their action as jurors.

Bontecou, it is true, was brought to make answer that he could render a fair and impartial verdict, in accordance with the law and the evidence, but that result was reached only, after a singularly argumentative and persuasive cross-examination by the court, in which the right of every person accused of crime to an impartial trial, and to the presumption of innocence until proved guilty beyond a reasonable doubt, and the duty of every citizen, when summoned as a juror, to lay aside all opinions and prejudices and accord the accused such trial, were set forth and descanted upon at length, and in which the intimation was very clearly made that a juror who could not do this was recreant to his duty as a man and a citizen. Under pressure of this sort of cross-examination, Bontecou seems to have been finally brought to make answer in such way as to profess an ability to sit as an impartial juror, and on his so answering he was pronounced competent, and the challenge as to him was overruled. Whatever may be the weight ordinarily due to statements of this character by jurors, their value as evidence is in no small degree impaired in this case by the mode in which they were, in a certain sense, forced from the mouth of the juror. The theory seemed to be, that if a juror could in any way be brought to answer that he could sit as an impartial juror, that declaration of itself rendered him competent. Such a view, if it was entertained, was a total misconception of the law.

Juror Clark, however, when asked by the court whether, if taken as a juror, he would be able to render an impartial verdict, answered: "I should endeavor to do so certainly," but to the question: "Do you think you could?" he said: "I do not know, Judge, whether I would want to say that I could or not." On being further questioned, he explained: "I want to convey this idea; that I am strongly prejudiced. I would get away from my prejudice if I could. If I was serving on

this jury I certainly should try to throw aside prejudice and give my decision on the law and the evidence as presented to me." In another place, in answer to a question as to whether he could treat the testimony of members of Camp 20 according to the principles explained to him by the court, he said: " Well, that might be a prejudice ; it would be hard work for me to get over that prejudice, Judge." Then, after further and fuller explanation by the court· as to the rights of the accused to a fair trial, and as to the duties and responsibilities of citizens called upon to serve as jurors, the question was again put to him whether, upon the principles thus laid down, he could render a fair and impartial verdict, based alone upon the evidence and the law, he answered with apparent reluctance : " I think I could; yes, sir, I should try to." On this answer he was held to be competent. But his answers, when all are taken together, come far short of evidencing a belief, even in the juror's mind, that he would be able to give the defendants a fair and impartial trial, upon the law and the evidence.

The court, in his cross-examination of the jurors, appealed to their sense of duty to be impartial, and to their power to put aside their opinions and prejudices by force of will, and apparently convinced Bontecou of his ability to do so, and he was brought to answer accordingly. But even he, when his entire examination is considered, seems to have been doubtful of his ability to lay aside his opinions and prejudices and act impartially. In answer to questions similar to those, put to juror Clark, he said : " Your Honor, it does not seem possible for anybody to go with the jury without having this feeling I have ; and it don't seem to me that, because a person is sworn, that he can banish all this prejudice he has, and immediately say he has no opinion, and believe them innocent." In this he gave utterance to what the ordinary experience of men teaches. It requires no very profound knowledge of human nature to know, that with ordinary men, opinions and prejudices are not amenable to the power of the will, however honest the intention

of the party may be to put them aside.   They are likely to remain in the mind of the juror, in spite of all his efforts to get rid of them, warping and giving direction to his judgment, coloring the facts as they are developed by the evidence, and exerting an influence, more or less potent, though it may be unconsciously to the juror himself, on the final result of his deliberations.   To compel a person accused of a crime to be tried by a juror who has prejudged his case, is not to give him a fair trial.

Nor should a defendant be compelled to rely, as his security for the impartiality of the jurors by whom he is to be tried, upon the restraining and controlling influence upon the juror's mind of his oath to render a true verdict according to the law and the evidence.   His impartiality should appear before he is permitted to take the oath.   If he is not impartial then, his oath can not be relied upon to make him so.   In the terse and expressive language of Lord Coke already quoted, the juror should "stand indifferent as he stands unsworn."

The suggestion is made that, so far as the case is controlled by the statute, the power to determine the competency of the jurors is committed to the trial court and that the determination of the question by that court is final, and not subject to review on writ of error.   In this view we are unable to concur. At common law the decision of challenges to the favor was committed to triers, and it was held that their decision was final, and not subject to review on error.   But that rule has never obtained in this State, as was expressly held in *Winnesheik Ins. Co.* v. *Schueller*, 60 Ill., 465.   It was there insisted that a particular challenge was in the nature of a challenge to the favor, and that the court, acting as trier, having decided that the juror was competent, his decision, upon common-law principles, was final.   But this court said: " Such has never been the practice in this State, and we think it is the better rule, and that it is our duty, to review the action of the court below in all cases, as to the competency of jurors."   It should

be observed moreover that this court has repeatedly reviewed the decisions of the trial courts as to the competency of jurors, in cases arising under the statute, and its authority so to do has not been questioned. *Plummer* v. *The People*, 74 Ill., 361; *Wilson* v. *The People*, 94 ib., 299; *Spies et al.* v. *The People*, 122 ib., 1.

The conclusions to which we have arrived in relation to the competency of the jurors in this case are not, in our opinion, in conflict with the decisions in *Wilson* v. *The People*, and *Spies et al.* v. *The People*, just cited. In the *Wilson* case, the juror testified that he had read the newspaper accounts of the crime, and had conversed with several persons while in attendance upon court in relation to it; that he had formed an opinion in the case, and would still have an opinion if the facts should turn out as he had heard them; that it would take some evidence to remove his opinion, but that he would be governed by the evidence, and could give the defendant a fair and impartial trial, according to the law and the evidence. We held the juror competent because his opinion seemed not to have been decided, but one of a light and transient character, which, even before the statute, would not have disqualified him, the case being one which would properly fall within the second branch of the rule laid down in *Smith* v. *Eames.*

The opinion of the juror challenged in the *Spies* case did not appear to be fixed or positive. He answered that, from all he had read and heard, he had an opinion as to the guilt or innocence of some of the defendants; that his opinion was made up from random conversations, and from newspaper reading, but from nothing reliable, or that he regarded as in the nature of sworn testimony; that he had never talked with the witnesses, or with any one having knowledge of the facts; and that he could listen to the evidence fairly and impartially and render a fair, impartial, unprejudiced and unbiased verdict. He never expressed his opinion, nor did it appear that evidence would be required to remove it. His answers as to his

ability to render a fair and impartial verdict were given readily and with apparent frankness, and there was nothing tending to impeach the finding of the trial judge that his answers in that behalf were true. The case therefore was one properly governed by the statute, or even under the rule existing prior to the statute, he might properly have been held to be competent. It was upon the ground that his opinions appeared to be merely light and transient that the ruling of the trial court denying the challenge was sustained.

His answer that he was prejudiced against anarchists was held not to disqualify him, as that appeared, from the facts disclosed at the trial, to be a prejudice against an unlawful and criminal organization, whose theories, if carried into effect, would involve the destruction of all law and government. This was held to be no disqualification, upon the principle that a man may have a prejudice against crime and still be a competent juror. In the present case, the evidence failed to show that the Clan-na-Gael society was an unlawful or criminal organization, or that, as an organization, it had anything to do with the alleged homicide. The prejudices of the jurors, therefore, against that organization, and against the defendants as members of it, had no such basis or justification as had the prejudice of the juror challenged in the *Spies* case.

We are of the opinion that jurors Bontecou and Clark, were disqualified, and that the decision of the court overruling the challenges to these jurors was erroneous. This error necessarily works a reversal of the judgment, as to the defendant in error, and disposes of the case before us. We therefore forbear an expression of any opinion as to the various other questions raised by counsel, but for the error above indicated, the judgment as to defendant Coughlin will be reversed, and the cause, as to him, will be remanded to the Criminal Court of Cook county for a new trial.          *Judgment reversed.*

Scholfield, J.: I dissent both from the reasoning and conclusion in the foregoing opinion.

Mr. JUSTICE MAGRUDER, dissenting :

I am unable to concur in the reversal of the judgment in this case. The judgment is reversed upon the alleged ground that Bontecou and Clark were not impartial jurors. In the abstract of the record prepared and presented to the Court by counsel for plaintiff in error, I find in the examination of Bontecou the following : " Do you believe, with your own knowledge of your own mental and moral make-up, that, if sworn as a juror in this solemn duty, you could render a fair and impartial verdict in this case, based exclusively upon the law and the evidence? A. I think I could. * * * Sitting here as a juryman would you have inclination to find this verdict otherwise than according to the evidence ? A. Why, I think that I could decide according to the evidence, I feel in this way about it : not having heard anything except the newspaper evidence I have a prejudice as it is. If there was evidence introduced to show that these parties were innocent, I think that I could give them the benefit of the doubt in this case and decide according to the evidence. * * * You mean by that word, inclination, that you have from your newspaper reading, of course, acquired some impression which may be unfavorable ? A. Yes, sir, that has expressed it. Would those opinions or impressions in any manner influence you here now, when you are sworn here to the solemn duty to try this case on the evidence ? A. No, sir. You are certain of that ? A. Positive of that."

In the same abstract there appears, in the examination of the juror Clark, the following: " I have an opinion as to the guilt or innocence of the defendants. It is based upon what I have read in the newspapers. * * * If taken as a juror, notwithstanding my opinion derived from newspaper reading, I should render a fair and impartial verdict in this case based upon the law and the evidence. * * * I have read the testimony that was given at the coroner's inquest, the testimony heard at Winnipeg, what purported to be the testimony given

before the grand jury in this city in June and July.   *   *   *
I think I have expressed opinions as to the guilt or innocence
of the men on trial.   *   *   *   I have an opinion as to whether
the doctor was tried by Camp 20 last spring; also an opinion
whether he was put to death in pursuance of the finding of
that committee. I have a prejudice against the Clan-na-Gael
society only as it has been brought to my mind in reading this
evidence.   *   *   *   You have stated, that, if taken as a juror
in this case, you could render a fair and impartial verdict based
exclusively on the law and the evidence notwithstanding your
opinion? Ans. Yes, sir; I have no doubt about that. Would
you treat the testimony of members of Camp 20 of the Clan-
na-Gael the same as you would any other witnesses up to the
time that it appeared that the Clan-na-Gael or that camp had
anything to do with this matter? Ans. I may have an opinion,
prejudice against them, against their views.   *   *   *   Is it
upon the understanding that it is an unlawful or criminal
combination? Ans. Yes, sir. Unless that appeared in the evi-
dence, would you allow it to influence your consideration of
the evidence here as a juror, or your verdict as a juror? Ans.
I think I would be able to cast that aside and give my verdict
according to the evidence, the law and the evidence in the case.
*   *   *   I shall certainly try to throw aside prejudice and
give my decision on the law and the evidence as presented to
me.   *   *·   *   Don't you believe that sitting here as a jury-
man, feeling the full responsibility as a juror, trying your fel-
low-citizens for a grave matter, where their lives and liberty
are in jeopardy, that you would act according to these legal
principles, and render a fair and impartial verdict, based alone
upon the evidence and the law. What do you say to that?
Ans. I think I could. Yes, sir, I should try to."

The majority opinion shows that other answers than those
above quoted were made by the jurors Clark and Bontecou,
but those here set forth are sufficient to establish their com-
petency to sit as jurors. When plied with questions they did

not deny that they had received impressions and formed opinions as to the guilt or innocence of the accused. Their frankness in revealing their thoughts and feelings in regard to the issues involved, instead of disclaiming all bias of any kind, bespeaks their conscientiousness and honesty of purpose. Whenever the questions addressed to them brought their attention back to the foundations of their impressions and opinions and to the effect thereof upon their mental conditions, two facts were most clearly disclosed : first, that the impressions received or opinions formed by them were such only as were based upon newspaper statements; second, that they believed in their own ability to fairly and impartially render a verdict in the case in accordance with the law and the evidence.

At the present day and in this country there is a general diffusion of intelligence among the people. Nearly everybody, who knows how to read, reads the newspapers. When a great crime is committed which excites public interest, there is scarcely a man in the community where it occurs, who does not know of it, and read about it, and form some sort of an opinion in regard to it. If men, who read, and are affected by, newspaper accounts of the commission of crime, are excluded from the jury box, then trial by jury might as well be abolished. In recognition of the difficulty of obtaining jurymen in criminal cases who do not read newspapers, and do not receive impressions from what they read, the legislatures of many of the States have passed laws upon this subject.

The statute of Illinois provides as follows :

"Provided further, That it shall not be a cause of challenge, that a juror has read in the newspapers an account of the commission of the crime with which the prisoner is charged, if such juror shall state, on oath, that he believes he can render an impartial verdict, according to the law and the evidence.

"And provided further, That in the trial of any criminal cause, the fact that any person called as juror has formed an

opinion or impression, based upon rumor or newspaper statements (about the truth of which he has expressed no opinion) shall not disqualify him to serve as a juror in such case, if he shall, upon oath, state that he believes he can fairly and impartially render a verdict therein in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement."

It was held by the Supreme Court of the United States in *Spies* v. *Illinois*, 123 U. S. 131, that this statute was not repugnant to the constitution of the United States, nor to the constitution of Illinois, which guarantees to the accused party in every criminal prosecution " a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

Bontecou and Clark do not state, that they ever expressed any opinion as to the truth of the newspaper statements from which they derived their impressions. This being so, and inasmuch as the only impressions or opinions formed by them were based upon newspaper statements, and inasmuch as they both stated upon oath that they believed they could fairly and impartially render a verdict in accordance with the law and the evidence, and inasmuch as the trial judge showed his satisfaction with the truth of their statements in this regard by permitting them to act as jurors in the case, why were they not qualified to take their seats in the jury box? Ought it to be decided, that they were disqualified when they held no other opinions than those, which, by the express terms of the law, are declared to be insufficient to disqualify them?

The mere fact, that a juror has expressed an opinion as to the guilt or innocence of the accused, when such opinion is based only on rumor or newspaper statements, does not necessarily disqualify him. (*Smith* v. *Eames*, 3 Scam. 76 ; *Gardner* v. *The People*, 3 Scam. 83 ; *Baxter* v. *The People*, 3 Gilm. 376 ; *Thomas* v. *The People*, 67 N. Y. 220 ; *Reynolds* v. *The United States*, 98 U. S. 145, 156 ; *Spies* v. *Illinois*, 123 U.

S. 131; *People* v. *McGonegal*, 136 N. Y. 62).   The test question as to the fairness and impartiality of the juror is, whether his verdict will be based only upon the account which may be given at the trial by witnesses under oath.  (*Spies* v. *Illinois, supra.*)   It sufficiently appears in this case from the examination of the above named jurors, that they would base their verdict only upon the account which should be given by the witnesses under oath at the trial.

The fact, that one of the jurors read in a newspaper what purported to be testimony taken at a coroner's inquest or before a grand jury, did not disqualify him.   Such publications of what purports to be evidence come under the designation of " newspaper statements " as those words are used in the statute.   It was so expressly decided in *Hopt* v. *Utah*, 120 U. S. 430, where the Court say :   " We think that evidence, or what purports to be evidence, printed in a newspaper, is a " statement in a public journal " within the meaning of the statute ; and that the judgment of the court upon the competency of the juror in such cases is conclusive."

It does not seem to me, that there was any such prejudice on the part of the juror Clark against the Clan-na-Gael Society as amounted to a disqualification.   He expressly states, that his prejudice against that organization was based solely upon the supposition, that a committee of one of its branches known as Camp 20 had assumed to try Dr. Cronin, and that he was put to death in pursuance of the finding of that committee.   If the Clan-na-Gael Society was a murderous organization, sentencing men to death who had incurred its anger and executing such unlawful sentences in secret, then a prejudice against it was nothing more than a prejudice against murder.   Prejudice against crime does not disqualify a juror. (*Spies* v. *The People*, 122 Ill. 1, and cases cited).   Clark said upon his examination, that, unless the Clan-na-Gael Society should appear from the evidence to be an unlawful or criminal

13—144 ILL.

society, he would be able to cast aside his prejudice against it and give his verdict according to the law and the evidence.

I can see nothing objectionable in the examination of the jurors by the trial Court. The law requires that Court to be satisfied of the truth of the statement made by the juror, that he believes he can fairly and impartially render a verdict in accordance with the law and the evidence. Here, the questions addressed by the trial judge to the jurors show, that he was making a conscientious effort to satisfy himself of what the statute made it his duty to be satisfied. Challenge for favor is based upon the bias or prejudice of the juror, and was originally ascertained by triers from whose decision there was no appeal. In this State challenges for favor are submitted to and passed upon by the trial judge. Though some of the answers of a juror taken separately may perhaps establish a disqualification, yet if the effect of all that he says is to show that he is a proper juror, he ought not to be excluded. (*Phelps* v. *The People*, 72 N. Y. 363). Under the statute above quoted, the trial court is clóthed with the power of deciding judicially, from all the answers of the juror in connection with his statement of his belief in his own ability to render a verdict in accordance with the law and the evidence, whether or not such juror is really capable of fairly and impartially trying the case notwithstanding the opinions which he entertains. The determination of the trial Court in this matter ought not to be disturbed except for manifest error. Nothing less than a finding contrary to the weight of the evidence, amounting to a palpable abuse of judicial discretion by the trial judge, should authorize a reversal. It does not appear here, that the statements of the jurors, which the court below found to be true, were, as matter of fact, untrue. (*The State* v. *Cunningham*, 100 Mo. 382).

These views are but a repetition of those expressed in reference to the statute now under consideration by the Supreme Court of the United States in *Spies* v. *Illinois*, *supra*, where Mr. Chief Justice WAITE used the following language: "In

*Reynolds* v. *The United States*, 98 U. S. 145–156, we said ' that, upon the trial of the issue of fact raised by a challenge to a juror, in a criminal case, on the ground that he had formed and expressed an opinion on the issues to be tried, the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence. The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest. It must be made clearly to appear that upon the evidence the court ought to have found the juror had formed such an opinion that he could not in law be deemed impartial. The case must be one in which it is manifest the law left nothing to the conscience or discretion of the court.' If such is the degree of strictness which is required in the ordinary cases of writs of error from one court to another, in the same general jurisdiction, it certainly ought not to be relaxed in a case where, as in this case, the ground relied on for the reversal by this court of the judgment of the highest court of the State, is that the error complained of is so gross as to amount in law to a denial by the State of a trial by an impartial jury to one who is accused of crime. We are unhesitatingly of opinion that no such case is disclosed by this record." In determining the competency of a juror under the circumstances here detailed, the trial judge has a right to take into consideration not only the statements made by the juror but also his appearance and bearing while subject to examination. Of course the reviewing court can know nothing about the appearance or bearing of the juror. (*Thomas* v. *People, supra*).

It will not do to say, that the fairness and impartiality of the juror are to be determined solely by such answers as he makes to the questions addressed to him in relation to his impressions or opinions without reference to his own estimate of the effect

of those impressions or opinions upon his capacity to decide fairly and impartially. The statute expressly empowers him to state under oath his belief as to his ability to fairly and impartially render a verdict in accordance with the law and the evidence. A conscientious juror could not state, that he had the belief referred to in the statute, if his existing opinions had conclusively biased his mind against the accused. A belief is a condition of mind ; and a statement of belief is necessarily a statement of the effect, which certain facts or opinions have had in producing that condition of mind. (*Lycoming Fire Ins. Co.* v. *Ward*, 90 Ill. 545 ; *Stokes* v. *The People*, 53 N. Y. 171 ; *Balbo* v. *The People*, 80 N.Y. 484 ; *Cox* v. *The People*, 80 N. Y. 512 ; *Abbott* v. *The People*, 86 N. Y. 460 ; *Corneth* v. *The People*, 92 N. Y. 85 ; *People, ex rel. Oyer & Term.*, 83 N. Y. 436 ; *People* v. *Otto*, 101 N. Y. 690 ; *People* v. *Mahoney*, 18 Cal. 183 ; *Leach* v. *People*, 53 Ill. 311 ; *Albrecht* v. *Walker*, 73 Ill. 69 ; *Thomson* v. *People*, 24 Ill. 60 ; *Collins* v. *People*, 48 Ill. 145 ; *Wilson* v. *People*, 94 Ill. 299 ; *Kroer* v. *People*, 78 Ill. 294 ; *Curley* v. *Com*, 84 Pa. St. 151). If a juror's statement as to his own mental condition when he expresses his belief in his ability to decide the case according to the law and the evidence cannot be accepted as showing his fairness and impartiality, then his statement as to his mental condition when he says that he has a prejudice against the prisoner ought not to be accepted as showing his unfairness and partiality.